United States District Court
Southern District of Texas
**ENTERED**
June 24, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JASON JANUARY, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-21-303 |
| | § | |
| CITY OF HUNTSVILLE, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

Jason January worked as a full-time firefighter for the City of Huntsville for nearly two decades. Beginning in 2015, he had gastrointestinal issues that required him to heavily medicate during flare ups. January and the City arranged that depending on when then flare ups occurred, he would leave work early or call in sick.

In 2016, January was placed on a year probation when an investigation revealed that he had solicited prescription medication from another firefighter. In December 2017, January submitted a letter of resignation because he planned to take a position with another city. January later changed his mind and attempted to rescind his resignation. Although the City of Huntsville permitted January to rescind his resignation, the City did not promote him to officer positions that came open in 2018. January had served as a training officer and that position was revoked. January met with City Manager Aron Kulhavy and Human Resources Coordinator Marla Diers in November 2018 to notify them that he thought these actions were discriminatory.

In March 2019, January went to City Hall to make copies of paperwork to file a U.S. Equal Employment Opportunity Commission charge. City employees working at City Hall that day

reported that January appeared to be under the influence of some intoxicant and looked and sounded and "groggy." Then City Secretary, Brenda Poe, reported that January intimidated her and blocked her exit from the copy room. The City investigated the reports of January's behavior and fired him in April 2019.

January sued the City, alleging retaliation under the Age Discrimination in Employment Act, the Americans with Disabilities Act, and the Rehabilitation Act, and for disability discrimination and failure to accommodate under the Americans with Disabilities Act and the Rehabilitation Act.[1] After unsuccessful mediation attempts, the City moved for summary judgment. (Docket Entry No. 27). January responded, and the City replied. (Docket Entry Nos. 30, 35).

Based on the motion, response, and reply; and the applicable law, the court grants the motion for summary judgment. The reasons are explained below.

## I.    Background

The Huntsville Fire Department employed Jason January as a full-time firefighter from January 2000 to April 2019. (Docket Entry No. 27-3; Docket Entry No. 30 at 8). The job duties included fire suppression, rescue, EMS work, ventilation, forcible entry, salvage, overhaul, and fire prevention education. (Docket Entry No. 27-4). From at least 2009 to April 2018, January also served as the Department's training officer. He was paid a $100.00 monthly stipend for this work beginning in October 2015. (Docket Entry No. 27 at 9; Docket Entry No. 27-3; Docket Entry No. 30-1 at 34).

In June 2015, January had a cholecystectomy—a gallbladder removal surgery—and was hospitalized for nine days due to medical complications. (Docket Entry No. 27 at 10; Docket Entry

---

[1] January clarified in his response that he does not bring a separate claim for age discrimination. (Docket Entry No. 30 at 30).

No. 27-5 at 9–10; Docket Entry No. 30 at 8).  After that, January continued to have gastrointestinal problems.  No doctor has officially diagnosed January with a medical condition that would cause his symptoms.  (Docket Entry No. 27-5 at 11–12; Docket Entry No. 30 at 8).

January returned to work following the surgery and hospitalization.  (Docket Entry No. 27-5 at 10).  January and Fire Chief Grisham agreed that when he experienced gastrointestinal flare ups and took narcotic pain medication or muscle relaxants, he could call in sick or leave work early.  (Docket Entry No. 27-6 at 3; Docket Entry No. 30 at 8; Docket Entry No. 30-1 at 109–10).

January's flare ups continued.  He testified in his deposition that in early 2016, the police chief and director of public safety, Kevin Lunsford, ordered him to take a fit-for-duty exam.  (Docket Entry No. 27-5 at 13–14).  In February 2016, the doctor's report of the exam sent to the City stated:

> January was seen for a return to work and a fit for duty exam today. He . . . has had intermittent medical ailments requiring him to miss work over the last 8 or so months.  . . . I have evaluated him via history, physical, lift test and review of pertinent available records from the hospital and others (some have been requested and are still pending).
>
> At this time Mr. January is cleared to work regular duty. . . . He has been asked to and has agreed to take medication appropriately, including no sedating meds while at work.
>
> It is not totally clear the extent of his ailments or the chance of them recurring to the point that he would be unable to perform his usual duties at work.  Such circumstances will have to be tended to by himself, his employer and his attending physicians if the need arises.

(Docket Entry No. 27-8).  Despite the doctor's conclusion that January was cleared to work regular duty and to avoid any sedating medicines at work, January described in a declaration that he still has "constant pain," is nauseated three times per week, is sick for multiple days, and often has trouble sleeping.  He stated:

I have constant pain that sometimes becomes so intense that I have no choice but to take pain medication. At times, I have difficulty eating because I am nauseous and in pain. I deal with this through a highly restricted diet, but even then I become nauseated around three times per week. At times, I become sick for multiple days, experiencing nausea, diarrhea, severe fatigue, and incontinence. Likewise, it is often difficult for me to sleep because of the pain and nausea. This happens as much as half of the time. Even with these limitations, most of the time I was still able to work as a training officer or firefighter. But when my condition flared up, I was unable to work. I would take time off and take pain killers and muscle relaxants. The condition also affects my intestines and sometimes makes it difficult to urinate and defecate. In addition, it sometimes causes my blood sugar to drop. I am told that this is "late dumping syndrome," which means that my first meal after a period of illness can cause a drop in blood sugar.

(Docket Entry No. 30-1 at 109–10).

Shortly after the February 2016 fit-for-duty exam and report, Police Chief Lunsford sent a memorandum to January advising that the Chief had become aware of possible misconduct involving prescription medication. Police Chief Lunsford explained that,

[d]uring the week of February 8 - 12, 2016 I learned of information regarding your conduct, which if true constitutes misconduct in connection with your work as a Firefighter for the City of Huntsville Fire Department. This memorandum shall serve as a written internal or administrative complaint against you, Jason January, for the allegations generally described below:

You are alleged to have made at least two improper requests for prescription medication (pain killers) from a fellow employee. One such interaction allegedly occurred in a face-to-face meeting with John Waldo. The other interaction allegedly occurred via electronic communication with Mr. Waldo. At least part of the electronic communication reads something to the effect of "Don't forget. If you are throwing away those meds I am low and hurting all to hell". . . . I have grave concerns that you were attempting to inappropriately gain prescription pain medications from a fellow employee. Based on all the information above, I feel it imperative that I determine if you indeed actively sought medication not prescribed to you and/or if you have some sort of drug dependency that would hinder your job performance as a Firefighter.

4

> . . .
>
> An internal investigation into this matter has been ordered to
> determine whether any evidence of wrongdoing supports the
> allegations of misconduct.
>
> . . . .
>
> Effectively immediately, you will be on Administrative Leave with
> pay, pending the outcome of this internal investigation. . . .

(Docket Entry No. 27-10 at 3–7).

During the investigation and paid leave, January sent a memorandum to a police lieutenant,

discussing the allegations.  January admitted to asking a fellow employee for his leftover pain

prescription medication, stating:

> Recently, I had a conversation with EMC Waldo in which we both
> were discussing our ailments. . . . I remember the conversation
> where he explained he did not take his medicine that he had for pain.
> . . . I am not certain what exactly I said, but I did tell him if he was
> not going to use them I am in a lot of pain all the time. . . .
>
> On a separate date, I sent him a text message where I told him "Don't
> forget.  If you are throwing away those meds I am low and hurting
> all to hell". . . .
>
> Both conversations were a poor choice and I should not have
> discussed that with EMC Waldo.

(*Id.* at 17).

Police Chief Lunsford completed the investigation in March 2016.  He concluded that

"Firefighter January attempted to have Firefighter Waldo distribute drugs to Firefighter January

which had been prescribed to him."  (*Id.* at 1).  Police Chief Lunsford concluded that January's

actions violated a City policy, which prohibits illegal distribution of drugs.  (*Id.*).  Police Chief

Lunsford also concluded that a firefighter who "illicitly conspire[s] to obtain a prescribed, narcotic

drug belonging to another has the potential be very damaging to the City's reputation."  (*Id.*).

Under another City policy, such a finding permitted disciplinary action up to and including termination. (*Id.* at 1–2).

The City took the following corrective measures against January:

> (1) 24 hours suspension without pay;
> (2) One year disciplinary probation;
> (3) The City reserves the right to conduct random drug testing at any time;
> (4) The City reserves the right to require appropriate documentation for any medical absences.

(*Id.* at 2). Police Chief Lunsford warned January that future policy violations would not be tolerated, and that if additional violations occurred, "further disciplinary actions may, and most assuredly will, occur—up to and including termination of employment." (*Id.*).

In December 2017, January sent a letter of resignation to Police Chief Lunsford, explaining that he had accepted a full-time position beginning in January 2018, with the Cypress Creek Fire Department:

> I have had conversations with the Fire Chief of Cy Creek about my position in Huntsville, and he understands that for the first quarter of 2018, I would be dealing with the transition of information to the new training officer which will be appointed by the Fire Chief.
>
> At that position I will be working less hours than I do here, as it is all administrative. I may work any of the 7 days of the week at Cy Creek, and I expressed in full detail to the Chief at Cy Creek, how the City of Huntsville Fire Department has me obligated to shifts for those three months.
>
> At this time, barring any unforeseen changes, I plan to leave the Huntsville Fire Department on March 31, 20[18], as a full time firefighter and transition to a volunteer firefighter. This transition has been approved by Tom Grisham as of noon on 12.18.17.

(Docket Entry No. 27-11). Police Chief Lunsford accepted the resignation on January 3, 2018. (Docket Entry No. 27-12).

6

On February 22, 2018, January changed his mind.  He asked Fire Chief Grisham if he could rescind his letter of resignation.  (Docket Entry No. 27-14).  Because Fire Chief Grisham had announced his own retirement, his successor would decide whether January's resignation could be rescinded.  (Docket Entry No. 27-5 at 22–23; Docket Entry No. 27-6 at 4; Docket Entry No. 30-1 at 203).  Several days later, with his request to rescind his resignation still pending, January applied for the open fire chief position.  (Docket Entry No. 27-16).

The City formed a hiring committee to decide who would take Fire Chief Grisham's place. The committee consisted of Police Chief Lunsford, City Manager Aron Kulhavy, Human Resources Director Julie O'Connell, and Risk Manager Ray Fleming.  (Docket Entry No. 27-6 at 4).  The applicants included firefighter January, Assistant Fire Chief John Hobbs, Captain Greg Mathis, and four other firefighters besides January.  The committee interviewed each applicant in March 2018.  (*Id.* at 6).  The Committee then interviewed four candidates—not including January—a second time, and chose Greg Mathis, a firefighter with 28 years of experience, as the new chief.  (*Id.* at 6–7).  January agreed that Greg Mathis and each of the other three finalists were or could have been qualified to be Fire Chief.  (Docket Entry No. 27-5 at 24–25).

As new Fire Chief, Mathis accepted January's request to rescind his resignation letter, but removed him from his position as a training officer and announced it as an open position.  (Docket Entry No. 27-17; Docket Entry No. 30 at 9; Docket Entry No. 30-1 at 112).  Fire Chief Mathis also announced a new fire inspector position and four new officer positions at the rank of captain. (Docket Entry Nos. 27-15, 27-17).  January applied for the training position and the four officer positions, without success.  (Docket Entry No. 30-1 at 204).  Fire Chief Mathis appointed Norman Langwell, a 48-year-old firefighter with 15 years of service, as the training officer, Darren Parker, a firefighter with 11 years of service, as the fire inspector, and firefighters Trey Lamb, Tim Buhler,

Brandon Kolaja, and Chase Wood, whose total years of service ranged from 10 to 19 years, as the new company officers.  (Docket Entry No. 27 at 15; Docket Entry No. 27-5 at 27–28; Docket Entry No. 27-6 at 7–8).  January agreed that those selected were qualified.  January was nonetheless upset when he was not selected for the training position because "he felt these decisions were discriminatory on his disability and age, among other things."  (Docket Entry No. 27-5 at 27–28, 31–32; Docket Entry No. 30 at 9).

In November 2018, January met with City Manager Kulhavy and Human Resources Coordinator Marla Diers for the first time to discuss January's concerns over disability and age-based discrimination, harassment, and retaliation.  (Docket Entry No. 27-5 at 33–34).  January presented a PowerPoint presentation laying out complaints arising from (1) the City's decision to make Mathis the Chief; (2) Chief Mathis's decision to replace January as the training coordinator; and (3) Chief Mathis's decision to select other firefighters for the fire inspector and officer positions.  (Docket Entry No. 1 at ¶ 12; Docket Entry No. 30-1 at 176–234).  The next day, City Manager Kulhavy emailed January paperwork to help him make an accommodations request under the Americans with Disabilities Act.  (Docket Entry No. 27-7).  January responded to Kulhavy that he was not requesting an accommodation.  Instead, he wanted only "to not be singled out/targeted for having a condition, that at times requires [him] to take medicine when not at work."  (*Id.*).  The City hired outside counsel to investigate in December 2018.  (Docket Entry No. 1 at ¶ 13; Docket Entry No. 6 at ¶ 3).  A few months later, in February 2019, January told City Manager Kulhavy he planned to go to the Equal Employment Opportunity Commission.  (Docket Entry No. 30-1 at 98).

On March 28, 2019, January went to City Hall to make copies for an Open Records Act request for documents that he was hoping to supply to the Texas Workforce Commission.  (Docket Entry No. 30-1 at 102).  January testified at his deposition that he remembers being "very tired"

that day.  (*Id.* at 103).  City Secretary Brenda Poe reported that she thought that January's speech had sounded "slurred and relaxed," and accompanied him to make a copy of his paperwork. (Docket Entry No. 27-1 at 10).  Based on previous phone calls between Poe and January that day, Poe knew that the paperwork was in relation to January's plan to file an Equal Employment Opportunity Commission complaint against the City.  (Docket Entry No. 30-1 at 142).  Poe later reported to the Texas Workforce Commission that as she was making the copies, January stated, "[w]hen all of this comes out, they're going to be sorry that they messed with me."  (*Id.* at 145). Poe was intimidated by his tone, and because she and January were in the small copy room, she reported that she felt blocked in by January.  (Docket Entry No. 30-1 at 140).  Poe eventually got past January and ran into a women's restroom.  (*Id.*; *see also* Docket Entry No. 27-1 at 11).  January testified that he does not recall "blocking" Poe or noticing that she was frightened.  (Docket Entry No. 30-1 at 103).

    January went from the copy room to City Manager Kulhavy's office.  Several employees present reported that they thought January appeared to be under the influence of some substance and was not acting in accordance with his normal demeanor.  (Docket Entry No. 27-1 at 9–14).

    January has since stated that he was not in fact intoxicated, insubordinate, or disruptive, but that he may have seemed abnormal because of low blood sugar.  (Docket Entry No. 30-1 at 165).  January refused a drug test at the time of the incident.  He submitted lab paperwork showing that he took one the next day at 10:30 a.m. with a negative result.  (*Id*. at 175).

    A video taken on the day of the incident shows January sitting on a couch in the City Mayor's office explaining that he had not slept for days.  (Docket Entry No. 33).  A City employee offered to take him home, but he opted to have his wife pick him up.  (*Id.*).  The video shows January appearing lethargic but not slurring words.  He remained seated on the couch and did not

argue with the officers in the office.  (*Id.*).  January was repeatedly asked if he was "on" anything, which he denied.  January later reported to the Texas Workforce Commission that when he got home, he took a test that showed he was experiencing low blood sugar, which can make him "appear intoxicated."  (Docket Entry No. 30-1 at 158, 165).

On April 1, 2019, Police Chief Lunsford sent a memorandum to January notifying him of a complaint against him.  (Docket Entry No. 27-1 at 5).  The memo stated:

> On or about Thursday, March 28, 2019, on your scheduled day off, you telephoned City Hall.  You reportedly displayed slurred, partially incoherent speech and demeanor that caused employees to be concerned about your condition.  Out of an abundance of concern this was reported to the City Manager who also overheard parts of the conversation.  He concurred that you sounded partially incoherent and he reported that to me.  Later that day, you physically went to City Hall and displayed the same mannerisms.  This was so concerning that the police were called to investigate.  Lt. Jim Barnes, Sgt. Slavin Richards, and myself responded to City Hall and made contact with you in the City Manager's office.  While there I personally observed the same behavior.  During our interaction you noted that you were not on any medication that would cause such behavior but were merely sleep deprived.  You were offered, and refused, a urine screen and a Horizontal Gaze Nystagmus evaluation.  Due to your impairment you were not allowed to drive. You were permitted to leave with your wife.
>
> Your behavior was so extreme that I had serious doubts about your ability to perform your duties at your next scheduled shift assignment.  At my direction, Chief Mathis notified you by phone that you were being placed on Administrative Leave with pay pending further notice.  This memorandum serves to memorialize that conversation and is official written notice of Administrative Leave with pay. . . . An internal investigation into this matter has been ordered to determine whether any evidence of wrongdoing supports the allegations of misconduct.

(Docket Entry No. 27-1 at 6–7).

10

Police Chief Lunsford assigned Darryle Slaven, Assistant Chief of Police, to investigate. (Docket Entry No. 27-1 at 8).  On April 5, 2020, Slaven sent a memorandum to Chief Lunsford summarizing his investigation and findings:

- Slaven was aware that Police Chief Lunsford and Lieutenant Barnes had responded to an incident at City Hall involving January on Thursday, March 28, 2019, around 4:00 p.m. (Docket Entry No. 27-1 at 9).

- Slaven watched Sergeant Richards's Body Worn Camera footage from the day of the incident.  Slaven concluded that based on 20 years of knowing January, January's speech was impaired, and he was "lethargic and confused."  (Docket Entry No. 27-1 at 9).

- Slaven spoke with a City Hall employee who had known January for 12 years.  That employee observed January to be in a much "darker" state than normal when he arrived at City Hall on March 28, 2019.  His hands were shaking when he tried to use the stapler, and he "exhibited slurred speech."  (Docket Entry No. 27-1 at 10).

- Slaven spoke with City Secretary Poe, who reported that on March 28, 2019, (1) Poe received a voicemail from January in which his speech was "slurred and relaxed," different from the normal "quick, sharp, and precise" demeanor that Poe had observed in the past, (2) Poe answered another call from January, which City Manager Kulhavy overheard and told Poe to let him know if January came to City Hall, (3) after several emails between Poe and January, January went to City Hall to make copies, (4) Poe accompanied January to the copy room, where he blocked her in and told her "when all this information comes out you'll understand why they shouldn't have messed with me," and (5) Poe felt intimidated in the copy room with January and ran out into the women's restroom when she had an opportunity.  (Docket Entry No. 27-1 at 11).

- Slaven spoke with Bill Wavra, a City IT Director, who observed the phone call between Poe and January.  Wavra reported that he had recognized January's voice and noticed his "words were drawn out," he "had slurred speech," he "took longer than usual to respond," he "repeated himself," and he "had a hard time articulating himself."  Wavra thought January was impaired and the actions were "unbecoming" of a City employee.  (Docket Entry No. 27-1 at 11).

- Slaven spoke with Lieutenant Barnes, who investigated after reports of January's unusual behavior at City Hall.  Barnes reported that on the day of the incident Police Chief Lunsford told him that January had called City Hall sounding impaired, and Chief Lunsford notified Lieutenant Barnes again when January was at City Hall.  Sergeant Richards and Barnes went to City Hall.  They found January in City Manager Kulhavy's office, sitting on the couch.  Barnes had known January for 25 years.  Barnes thought that January was not in a normal state because he spoke slowly, was "thick tongued" and "slouched over," and appeared impaired.  Before January's wife arrived to pick him up, Lieutenant Barnes saw January's "pupils were very constricted, glassy and watery."  (Docket Entry No. 27-1 at 12).

- Sergeant Richards also described the incident to Slaven.  Chief Lunsford had told Richards at the police department that January had called City Hall in an impaired state and told Richards to be ready to respond.  Richards went to City Hall with Lieutenant Barnes when it was reported that January was there.  Sergeant Richards wore a body camera to record the incident.  Richards thought that January did not appear to be himself.  (Docket Entry No. 27-1 at 12–13).

- Most employees that Slaven spoke to during the investigation agreed that January's actions and behavior on the day of the incident brought discredit to himself or the department.

(Docket Entry No. 27-1 at 15).

Slaven asked January to write a memorandum explaining his account of the events. January did so, on April 3, 2019, stating:

> On Thursday of last week, I had a document that I needed to share with the City Secretary. I was off work, and not due to be on a fire shift until Sunday of the following week. While I was at City Hall, I had a conversation with the City Manager and during that conversation he told me that he was worried about me and that I appeared confused and not like my actual self. . . .
>
> . . .
>
> I had not had sleep for days due to not feeling well and problems at my home. I was not under medicine that would put me into any type of slumber, daze, confusion or slurred speech. I did not have anything to drink in any form that day either. I would estimate that I was on about 4 hours of sleep in 4 days, and was very tired. I was unable to sleep, and I had been throwing up most of the food that I would eat. I believe this was the cause of the appearance of a worn out and confused person.

(Docket Entry No. 30-1 at 236). On the same day, January received an email from Kulhavy that outside counsel had provided a final report on January's discrimination, retaliation, and disability claims from November 2018 concluding that there was "no factual or legal basis" for his claims. (Docket Entry No. 30-1 at 237).

Based on Slaven's report and findings, Police Chief Lunsford sent January a memorandum on April 12, 2019, concluding that January's behavior on March 28, 2019, violated several City policies. This conclusion, taken in conjunction with the sustained complaint against January in 2016, warranted January's termination. (Docket Entry No. 27-1 at 1–4). The undisputed evidence showed that it was reasonable to conclude from January's behavior on March 28, 2019, that he

13

was intoxicated or under the influence of some substance.  After Police Chief Lunsford issued his

decision, January appealed the decision, mentioning that his drug test was negative:

> 15 hours after I was at City Hall, I was at a Drug Testing Facility,
> giving a urinalysis.  I told Chief Slaven, Chief Mathis and Chief
> Lunsford I had done so, and that the results would show that this
> was a medical issue, not a pharmaceutical one. . . . I did explain I
> had the NEGATIVE results back to Chief Slaven 2 days before via
> telephone and that I needed to contact the Chief of Police (who was
> sick) to give him the paperwork.  My electrolytes were down from
> me being up for days sick with my intestinal illness, and I had
> Hypoglycemia at the time.

(Docket Entry No. 30-1 at 242).   January's response did no dispute that it was objectively

reasonable to believe that January was impaired at City Hall, nor did it dispute his behavior and

actions resulting from the impairment on the day in question.  On May 1, 2019, City Manager

Aron Kulhavy affirmed Chief Lunsford's decision to terminate January in response to January's

appeal.  (*Id.* at 243).

Shortly after January was fired, he submitted a charge of discrimination to the Texas

Workforce Commission alleging that the City separated his employment due to his disability and

age.   The Texas Workforce Commission completed its investigation on June 1, 2020, and

concluded that "the evidence does not establish that [January's] treatment by the employer was

based on Age, Record of Disability, Regarded as Disabled, Retaliation, or any other reason

prohibited by the laws."  (Docket Entry No. 27-6 at 14).  The Equal Employment Opportunity

Commission affirmed the Texas Workforce Commission's conclusion that the City did not violate

Title VII or the Americans with Disabilities Act when the City fired Plaintiff and adopted the

Texas Workforce Commission's findings.   (Docket Entry No. 27-6 at 17).   After the Equal

Employment Opportunity Commission issued a right to sue letter in October 2020, January sued

the City in January 2021.  (Docket Entry No. 1).

## II.     Legal Standard

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd ex rel. Est. of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)).  "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 611 (5th Cir. 2018) (citations and internal quotation marks omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings."  *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010).  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).  "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence."  *Lamb v. Ashford Place Apartments LLC*, 914 F.3d 940, 946 (5th Cir. 2019) (citation and internal quotation marks omitted).  In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor."  *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)).

## III.     The Summary Judgment Evidence

In support of its motion, the City submits the following summary judgment evidence:

- documents relating to the City's April 2019 investigation of January, (Docket Entry No. 27-1);

- portions of the City's Policy and Procedures Manual, (Docket Entry No. 27-2);

- the City's personnel action forms, (Docket Entry No. 27-3);

- the City's firefighter job description, (Docket Entry No. 27-4);

- excerpts of deposition testimony by January, (Docket Entry No. 27-5);

- documents relating to the Texas Workforce Commission investigation, (Docket Entry No. 27-6);

- November 2018 emails between January and Kulhavy, (Docket Entry No. 27-7);

- Dr. Francis Morrison's letter dated February 15, 2016, (Docket Entry No. 27-8);

- documents relating to January's workplace injuries and illnesses, (Docket Entry No. 27-9);

- documents relating to the City's 2016 investigation of January, (Docket Entry No. 27-10);

- January's letter of resignation dated December 18, 2017, (Docket Entry No. 27-11);

- January 2018 emails between January and Chief Lunsford, (Docket Entry No. 27-12);

- documents relating to January's employment with the Cypress Creek Fire Department, (Docket Entry No. 27-13);

- February 2018 emails between January and Chief Grisham, (Docket Entry No. 27-14);

- April 2018 memoranda from Chief Mathis announcing open positions, (Docket Entry Nos. 27-15, 27-17);

- January's February 27, 2018, letter, (Docket Entry No. 27-16);

- the City's blank request for accommodation form, (Docket Entry No. 27-18); and

- January's employee performance reviews, (Docket Entry No. 27-19).

In support of his response to the City's summary judgment motion, January submits the following summary judgment evidence:

- a March 10, 2022, discovery letter to Chief Judge Rosenthal and related correspondence, (Docket Entry No. 30-1 at 2–5);

- a copy of a judicial opinion, (Docket Entry No. 30-1 at 6–30);

- January's deposition testimony, (Docket Entry No. 30-1 at 31–108);

- declaration by January, (Docket Entry No. 30-1 at 109–110);

- transcript of meeting between Chief Mathis and January, (Docket Entry No. 30-1 at 111–15);

- transcripts of calls with the Texas Workforce Commission, (Docket Entry No. 30-1 at 116–74);

- January's March 29, 2019, drug test, (Docket Entry No. 30-1 at 175);

- January's November 2018 PowerPoint presentation, (Docket Entry No. 30-1 at 176–235);

- documents relating to the City's April 2019 investigation and termination of January, (Docket Entry No. 30-1 at 236–46);

- Dr. Francis Morrison's letter dated February 15, 2016, (Docket Entry No. 30-1 at 247); and

- a video of January at City Hall on March 28, 2019, (Docket Entry No. 33-1).

January argues at the eleventh hour in his response to the City's motion for summary judgment that summary judgment is not appropriate because there are ongoing discovery issues. January submits a letter and email he sent to the court's case manager in March 2022 requesting a discovery conference. January explained in the letter that he had not received certain documents in discovery:

- a copy of the City Hall floor plan to show the location of the various incidents described by Poe;

- a copy of the recording made by Ms. Poe;

17

- a copy of Poe's charge of discrimination, the City's response, and the settlement agreement;

- a copy of the materials provided to the mayor or city council in connection with Poe's termination, including an Human Resources memo in February 2020;

- January's investigation file prepared by the City's outside counsel;

- a copy of January's inbox and outbox at the City;

- a copy of January's text messages with other City employees; and

- January's communications to the City regarding his Open Records Act requests.

(Docket Entry No. 30-1 at 2–5).

January has not contacted the court again about these discovery issues.   Since then, the parties have had two settlement conferences with Judge Sheldon and filed multiple unopposed motions for extension of time.   (Docket Entry Nos. 21, 25, 28, 31).   January has had ample opportunity to follow up with the court since March 2022 but has not.   Nor has he explained how getting the documentation would enable him to respond to the summary judgment motion or why he cannot frame a response without the information already disclosed.   For the reasons described below, January's claims are dismissed on the basis that he failed to request an accommodation (which is something he has personal knowledge of and could have disputed at summary judgment), failed to establish that there was a link between his disability or protected activities and his ultimate firing, and that he failed to establish that Chief Lunsford's decision to terminate him—which was based on the knowledge Chief Lunsford had when he fired January on April 12, 2019, not facts that came to light after that date—was pretextual.   January points to no evidence, that given more discovery, would make a material difference to this analysis.   The materials that January requests are either privileged or would not contradict the knowledge that Chief Lunsford had about the City Hall incident on the date of the termination decision.

Under Rule 56(d) of the Federal Rules of Civil Procedure, January has failed to specify which "facts" he is unable to present due to the lack of requested materials and why they are "essential" to his opposition.  FED. R. CIV. P. 56(d).  Nor has he shown that he "diligently pursued discovery."  *Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797, 816 (5th Cir. 2017) (quotation omitted).  January's Rule 56(d) request is denied.

## IV.    Analysis

### A.    Disability Discrimination

The Americans with Disabilities Act prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . advancement . . . of employees . . . and other terms, conditions, and privileges of employment."   42 U.S.C. § 12112(a).   "The [Rehabilitation Act] and the [Americans with Disabilities Act] are judged under the same legal standards, and the same remedies are available under both Acts."  *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (citation omitted).  "To make a prima facie case of disability discrimination under the [Americans with Disabilities Act], [the plaintiff] must establish that '(1) [he] has a disability or was regarded as disabled, (2) [he] was qualified for the job, and (3) [he] was subject to an adverse employment decision on account of [his] disability.'"  *Jennings v. Towers Watson*, 11 F.4th 335, 344 (5th Cir. 2021) (citing *Caldwell v. KHOU-TV*, 850 F.3d 237, 241 & n.4 (5th Cir. 2017)).

Disability "discrimination [also] includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *Jones v. Lubbock Cty. Hosp. Dist.*, 834 Fed. Appx. 923, 926 (5th Cir. 2020) (per curiam) (citing 42 U.S.C. § 12112(b)(5)(A)).  January "must prove the following statutory elements to prevail in [his] failure-to-accommodate claim: (1) [he] is a qualified individual with a disability; (2) the

disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 587 (5th Cir. 2020) (alterations in original) (quoting *Feist v. La., Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450, 452 (5th Cir. 2013)).

"To avoid summary judgment on whether he is a qualified individual, [the plaintiff] needs to show 1) that he could perform the essential functions of the job in spite of his disability or 2) that a reasonable accommodation of his disability would have enabled him to perform the essential functions of the job." *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093 (5th Cir. 1996)). "The [Americans with Disabilities Act] provides a right to reasonable accommodation, not to the employee's preferred accommodation." *E.E.O.C. v. Agro Distrib., LLC*, 555 F.3d 462, 471 (5th Cir. 2009) (citation omitted). "The plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform." *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007) (citation omitted).

"If the plaintiff only produces circumstantial evidence of discrimination, the well-known burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), guides [the court's] inquiry." *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019) (citation omitted). Under the *McDonnell Douglas* framework,

> [the plaintiff] must first make out a *prima facie* case of discrimination by showing that: (1) he has a disability or was regarded as disabled; (2) he was qualified for the job; and (3) he was subject to an adverse employment decision because of his disability. If he does, the burden shifts to [the employer] to articulate a legitimate, non-discriminatory reason for the adverse employment action. If [the employer] satisfies its burden, the burden shifts back to [the plaintiff] "to produce evidence from which a jury could conclude that [the employer's] articulated reason is pretextual."

*Id.* at 341–42 (citing *Williams v. J.B. Hunt Transp., Inc.*, 826 F.3d 806, 811 (5th Cir. 2016); *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016)).

The City first argues that January has not established that he has a disability. Under the Americans with Disabilities Act, "the term 'disability' means, with respect to an individual (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). Congress has instructed courts to construe "disability" broadly. *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 578 n. 15 (5th Cir. 2020).

January submitted evidence that since his gall bladder removal surgery in 2015, he has experienced undiagnosed gastrointestinal issues which make it difficult for him to eat due to intermittent nausea, that at times he experiences "diarrhea, severe fatigue, and incontinence" and drops in his blood sugar levels, and that his flare ups warrant the use of pain killers and muscle relaxants. (Docket Entry No. 30-1 at 109–10). He also describes himself as in "constant pain." (*Id.*). The City does not dispute that January experiences any of these symptoms. Instead, it argues that January has pointed to evidence showing only that he has an impairment, but not one that substantially limits major life activities. (Docket Entry No. 27 at 25).

The City relies on *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652 (5th Cir. 2003). The plaintiff, William Waldrop, was diagnosed with chronic pancreatitis, "which occasionally required him to miss a few days of work," and take pain medication for his condition. *Id.* at 654. The Fifth Circuit held that Waldrip had not offered evidence that his condition substantially limited his ability to eat

21

or perform major life activities.  *Id.* at 655–57.  When *Waldrip* was decided, however, courts strictly interpreted what constituted a disability under the Americans with Disabilities Act.  After *Waldrip* was decided, Congress amended the Americans with Disabilities Act, making "it easier for a plaintiff with an episodic condition . . . to establish that he is an 'individual with a disability.'" *Carmona v. Sw. Airlines Co.*, 604 F.3d 848, 855 (5th Cir. 2010) (citing ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat. 3553).

"The inquiry in [this] post-amendment case is thus whether [January's] impairment substantially limits his ability 'to perform a major life activity as compared to most people in the general population.'" *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 591 (5th Cir. 2016) (citing 29 C.F.R. § 1630.2(j)(1)(ii))).  "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."  29 C.F.R. § 1630.2(j)(1)(ii).  "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."  *Id.* § 1630.2(j)(1)(vii).

Under the post-amendment Americans with Disabilities Act, January has submitted sufficient evidence that he has a disability.  He has intermittent gastrointestinal issues which limit his ability to walk, sleep, eat, work, and digest, and that can sometimes be so painful as to require heavy pain medication.  (Docket Entry No. 30-1 at 44–55, 109–10, 186).  This is substantially limiting him compared to people in the general population when his condition is active.

The court also rejects the City's argument that January has not met his burden to show he is a "qualified individual" under the Americans with Disabilities Act.  "To be a qualified employee, [the plaintiff] must be able to show that he could either (1) perform the essential functions of the job in spite of his disability, or (2) that a reasonable accommodation of his disability would have

22

enabled him to perform the essential functions of his job." *Nall*, 917 F.3d at 342 (citation and internal quotation marks omitted); *see* 42 U.S.C. § 12111(8).  In other words, to be "qualified" Plaintiff must show "that either (1) [he] could perform the essential functions of the job in spite of [his] disability," or "(2) that a reasonable accommodation of [his] disability would have enabled [him] to perform the essential functions of the job." *Moss v. Harris Cnty. Constable Precinct One*, 851 F.3d 413, 417–18 (5th Cir. 2017) (citations omitted).

January performed his job as a firefighter from the time of his surgery to the time he was terminated.  He was not terminated due to his performance on the job, but rather because of the incident at City Hall.  January has met his burden to show that he could and was performing the essential functions of the job in spite of his disability.

However, the court agrees with the City that January has neither submitted nor pointed to evidence that raises an inference that he suffered an adverse employment action because of his disability.  January has pointed to no evidence, direct or circumstantial, that Police Chief Lunsford took January's disability into account in terminating his employment on April 12, 2019.  January had taken time off due to flare ups since 2015, without any adverse consequence apparent in the record.  There is no causal link between January's disability and his firing on April 12, 2019.

January argues disability discrimination is evident because although he was fired on March 28, 2019, for inappropriate and intoxicated behavior, it did not arise from drugs but from a blood sugar issue.  There is no evidence that when Chief Lunsford decided to terminate January on April 12, 2019, that he knew that January was experiencing low blood sugar on the day of the incident.  Chief Lunsford did know that January behaved inappropriately with other City employees.  The City documented several legitimate, nondiscriminatory reasons for January's termination on April

23

12, 2019.  And as explained more below, January has not met his burden to raise a dispute as to whether those reasons were pretextual.

January's failure-to-accommodate discrimination claim also fails; he neither submits nor points to evidence that he requested a reasonable accommodation that was not granted.

January has failed to make a *prima facie* case showing disability discrimination or a failure to accommodate under the federal discrimination laws.  His disability discrimination claims may not proceed.

### B.    Retaliation

January argues that the City retaliated against him in violation of the Americans with Disabilities Act, the Rehabilitation Act, and the Age Discrimination in Employment Act by firing him after he told several City employees that he intended to file a formal complaint.  The City does not dispute that January engaged in a protected activity, or that firing January was an adverse employment action.  The City argues that there is no evidence, circumstantial or direct, that Police Chief Lunsford knew of January's protected activity when the Chief decided to terminate January.

"To show an unlawful retaliation, a plaintiff must establish a *prima facie* case of (1) engagement in an activity protected by the [Americans with Disabilities Act], (2) an adverse employment action, and (3) a causal connection between the protected act and the adverse action. Once the plaintiff has established a *prima facie* case, the defendant must come forward with a legitimate, non-discriminatory reason for the adverse employment action.  If such a reason is advanced, the plaintiff must adduce sufficient evidence that the proffered reason is a pretext for retaliation.  Ultimately, the employee must show that 'but for' the protected activity, the adverse employment action would not have occurred."  *Nall*, 917 F.3d at 348–49; *see also Feist v. La.*

*Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013);  29 U.S.C. § 623(d) (Age Discrimination in Employment Act).

"A 'causal link' is established when the evidence demonstrates that 'the employer's decision to terminate was based in part on knowledge of the employee's protected activity.'" *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001) (quoting *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998)).  "Quite logically, '[i]f an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct.'"  *Wright v. Union Pacific Railroad Co.*, 990 F.3d 428, 434 (5th Cir. 2021) (quoting *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir. 1999)).  In *Nall*, a company did not permit a trainman diagnosed with Parkinson's disease to return to work after he was observed during a field exam violating safety rules.  917 F.3d at 339.  The trainman filed a discrimination charge with the Equal Employment Opportunity Commission.  The railroad continued to deny his requests to return to work based on the field exam and medical test result reports.  *Id.* at 339–40.  The Fifth Circuit held that the trainman had not pointed to summary judgment evidence demonstrating that  the decisions to deny his reinstatement were based on knowledge of his charge with the Commission.  As a result, the trainman failed to make a retaliation claim under the Americans with Disabilities Act as a matter of law.  *Id.* at 349.

January argues that the City had notice that he engaged in protected activity on two occasions: (1) when he told City Manager Kulhavy in February 2019 that he intended to file the claims of discrimination presented in his November 2018 PowerPoint with the Equal Employment Opportunity Commission; and (2) when he mentioned to former City Secretary Poe that he needed

to make copies of documents at City Hall relating to the charge he planned to file with the Commission.  (Docket Entry No. 30 at 13).

January, however, does not submit or point to evidence that Chief Lunsford, the decisionmaker, knew that January intended to file charges with the employment commissions when he fired January.  Instead, January argues that the court can make this inference because "Huntsville is not a large city and does not have a large city government," and "it is reasonable to infer that everyone at City Hall knew all about it."  (Docket Entry No. 30 at 13).  The record evidence does not support the broad inference that if one employee at the Huntsville City Hall knows something, all employees do.

Under Fifth Circuit precedent, January has not raised a factual dispute as to the link between his plans to complain to the Texas and U.S. employment commissions and Police Chief Lunsford's decision to terminate January's employment.  There is no record evidence that Chief Lunsford had knowledge of January's activities at the relevant time.  Nor is there evidence that Poe or Kulhavy told Chief Lunsford that they knew January was planning on filing a discrimination charge against the City.  Additionally, there is no evidence that Slaven, the person placed in charge of the investigation into January's misconduct at City Hall and reporting those findings to Chief Lunsford, knew that January planned on filing a formal discrimination charge against the City or was otherwise motivated by discriminatory animus.  *See also Hauser v. Schneider Electric Sys. USA*, *Inc.*, 819 Fed. Appx. 247, 250–51 (5th Cir. Aug. 4, 2020) (per curiam) ("A minimum requirement of causation is that the 'employer knew about the employee's protected activity.'" (quoting *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 (5th Cir. 2003))).

The City has submitted ample evidence that Police Chief Lunsford terminated January because of his behavior at City Hall on March 28, 2019, and the conclusion, after investigation,

26

that January's actions on that day violated several city policies.  January has not met his burden in return to raise a factual dispute as to whether Chief Lunsford's decision was pretextual.  "A plaintiff must 'produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination.'"  *Sears v. Zions Bancorporation NA*, No. 21-10448, 2022 WL 1800779, at *3 (5th Cir. June 2, 2022) (quoting *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 233 (5th Cir. 2015)).  "A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'"  *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)).  As the Fifth Circuit recently explained:

> Evidence is substantial if it is of such quality and weight that reasonable and fair-minded [triers of fact] in the exercise of impartial judgment might reach different conclusions.  Because [the employer's] reasons for [the plaintiff's] termination were her poor performance and demonstrated lack of effort to change her behavior[,] to prevail at this stage, [the plaintiff] must show that reasonable minds could disagree that these were, indeed, the reasons for her discharge. . . . But employment laws do not transform federal courts into human resources managers, so the inquiry is not whether [the employer] made a wise or even correct decision to terminate [the employee].  Instead, [t]he ultimate determination, in every case, is whether, viewing all of the evidence in a light most favorable to the plaintiff, a reasonable factfinder could infer discrimination.  Thus, evidence must be of sufficient nature, extent, and quality to permit a jury to reasonably infer discrimination.

*Owens v. Circassia Pharma., Inc.*, 33 F.4th 814, 826 (5th Cir. 2022) (citations and internal quotation marks omitted).

Two recent Fifth Circuit cases are instructive.  In *Owens*, the plaintiff-employee, an Asian woman, had two white male supervisors from 2015 into 2017.  *Id.* at 820.  She received performance reviews rating her 3 out of 5 stars, and each review flagged that "team development"

was an area that needed improvement.  *Id.*  In February 2018, the plaintiff-employee reported to her supervisor that an Account Director had made sexist comments to her.  *Id.* at 821.  The incident was reported to a Human Resources representative, who did not recall that the incident was reported as discrimination.  *Id.* at 822.  A month later, the plaintiff's supervisors met with her to inform her that based on her work performance, she would be placed on a Performance Improvement Plan along with two other white men.  *Id.*  At an April 2018 performance-plan meeting with the Human Resources Director, the plaintiff asserted that she was being discriminated against.  The Director interviewed several employees and could not substantiate the plaintiff's claims.  *Id.*  Over the following month, the supervisor continued to claim that he witnessed performance deficiencies, and the plaintiff continued to claim that she was being discriminated against.  *Id.* at 823.  The plaintiff was terminated at the end of her Performance Improvement Plan in June 2018.  *Id.*  The plaintiff argued that she had presented sufficient evidence at summary judgment to raise a factual dispute as to pretext on the ground that the termination decision was not "worthy of credence."

The plaintiff first argued that her employer had failed to investigate the claims that she underperformed and failed to investigate her discrimination allegations.  *Id.* at 828.  On this point, the Fifth Circuit emphasized that what mattered was whether the nature, extent, and quality of the information that the employer had gave rise to a rational inference that the reasons for the adverse employment action were "unbelievable"—not whether the investigation was sufficient or correct.  *Id.* at 829.  The plaintiff's employers had interviewed witnesses and investigated the claims.  Its reasons for not interviewing certain members of the plaintiff's team about her behavior were not suspicious because the plaintiff's supervisor based his decision on multiple conversations with members of her team.  The plaintiff  then argued that her employer's reasons for firing her were

"inconsistent with reality" and "illogical" based on her evidence that she had that contradicted her employer's version of the reasons for termination. While the Fifth Circuit recognized that she had "likely presented sufficient evidence for a reasonable factfinder to reject [her employer's] explanation for her termination, she has not presented sufficient evidence to permit a rational inference that the proffered reason was pretext for discrimination." *Id.* at 830.

In *Saketkoo v. Admins. Of Tulane Edu. Fund*, 31 F.4th 990 (5th Cir. 2022), the plaintiff-employee was an associate professor whose contract was continuously renewed from 2014 until 2019. *Id.* at 995. In 2017, the plaintiff reported to a new supervisor, who she accused of discriminatory treatment by failing to support her research as much as that of male colleagues. *Id.* at 996. Around September 2018, the plaintiff complained to colleagues, three other superiors, and the university's office of institutional equity. In February 2019, the plaintiff met with the Dean, who informed her that her contract would not be renewed for financial reasons. *Id.* The Dean later suggested to a doctor at the university's medical center that the doctor should not hire the plaintiff. *Id.* The plaintiff sued, claiming that the Dean "sabotage[ed]" her employment with the medical center in retaliation for her complaints. *Id.* at 1000. The Fifth Circuit found that the Dean had knowledge of her protected activities. But the record evidence did not support an inference of pretext because the evidence showed only that the Dean was motivated by a desire to prevent the medical center from acting inconsistently with the university, not with retaliatory motive. *Id.* at 1002–03.

January argues that he has met his burden at summary judgment to show that there are factual disputes material to determining whether the City's explanation for firing January is "unworthy of credence." January argues that Chief Lunsford's April 12, 2019, memorandum was pretextual because the reasons listed for terminating January were false or incorrect. What matters

is not whether Chief Lunsford's findings are ultimately proven true, but whether Chief Lunsford reason for making his findings when he wrote the termination memorandum were believable. *Owens*, 33 F.4th at 829.

January first takes issue with the following finding in Chief Lunsford's termination memorandum:

> The investigation revealed that there is a high probability that you were impaired.  Impairment was noted to the point that two ranking police supervisors indicated they would have arrested you for Public Intoxication had you attempted to leave without a safe ride home.  It should be noted that, more than once, you refused the offer of a Horizontal Gaze Nystagmus evaluation and a urinalysis. Taken in conjunction with your past behavior (2016) of attempting to entice a fellow employee to unlawfully provide you with prescription pain medication, I find this  complaint SUSTAINED.

(Docket Entry No. 30-1 at 238).  January argues that this finding is unworthy of credence because the video on the day in question shows January looking "just fine," with normal-sounding speech, meaning that he was not intoxicated.  Chief Lunsford did not find that January was intoxicated, but that he was reported as appearing impaired in some way.  Chief Lunsford based his findings that January was impaired on Slaven's investigation report.  Slaven interviewed City Secretary Poe; Mary Joyner, City Manager's Executive Assistant; Bill Wavra, IT Director; William Richards, Patrol Sergeant; Jim Barnes, Patrol Lieutenant; City Manager Kulhavy; January; January's wife; and Chief Lunsford.  Slaven had known January for 20 years.  He thought January appeared lethargic and confused in the body camera compared to January's normal disposition. Joyner, Wavra, Richards, Barnes, and Kulhavy, also each reported that January did not act in accord with his normal demeanor and appeared unprofessional, groggy, slouched over, or thick-tongued.  (Docket Entry No. 27-1 at 10–13).

January does not dispute that he appeared impaired.  January admits in the video that he had not slept for days.  January wrote his own memorandum during the investigation, stating that he was running on "4 hours of sleep in 4 days," and that he had been throwing up most of the food he ate, which gave him the "appearance of a worn out and confused person."  (Docket Entry No. 30-1 at 236).  He had previously described in a PowerPoint to City Manager Kulhavy that when he experienced low blood pressure, he could appear "intoxicated."  (Docket Entry No. 30-1 at 208).  Based on these reports of January's behavior on the day in question, Chief Lunsford reasonably concluded that January may have been impaired.  That does not support finding that Chief Lunsford had a discriminatory or retaliatory motive, even if January was not actually under the influence of drugs or alcohol.

Although January appealed Chief Lunsford's termination and then notified the City on appeal that he had experienced a medical issue on the day in question and that he had a negative drug test the following day, January does not argue that the City Manager Kulhavy's decision to affirm Chief Lunsford's conclusion that January committed *multiple* policy violations was unworthy of credence or pretextual.  And neither party submitted evidence that the negative drug test taken the day after the incident proved that January was not intoxicated or under the influence of a substance the day before.

January also takes issue with the City's finding that he "ignored responsible officials" by refusing their offers to drive him home and instead waiting for his wife to pick him up.  What matters is not whether the City was ultimately correct that January was "insubordinate."  The record shows that Chief Lunsford had the following information from Slaven's investigation:

> Lt. Barnes felt [] January was impaired and even asked [] January if he would allow him to check nystagmus on him, referring to Horizontal Gaze Nystagmus (HGN).  [] January asked what that was and continued rambling and never really advised if he would

31

> comply.  Ultimately, it was understood that [] January would not
> drive, however he refused all attempts for anyone at [City Hall] to
> give him a ride home, with him insisting on calling his wife to come
> get him. Prior to [] January's wife arriving, Lt. Barnes recalls
> looking closely at [] January's eyes and noticed that "his pupils were
> very constricted, glassy and watery".

(Docket Entry No. 27-1 at 12).  The issue is not whether Chief Lunsford's decision was correct or

good.  The issue is whether there was evidence of pretext.  There was not.

January also challenges the following findings relating to his behavior towards Poe:

> Your actions adversely affected the City's reputation based on your
> level of impairment, your unprofessional conduct, insubordination
> and unwillingness to cooperate with officials.
> . . .
> One example of disrespectful, unprofessional or disruptive behavior
> occurred in the copy room.  A fellow employee was intimidated and
> placed in fear when you blocked the employee's exit and stated
> something to the effect of "When all this information comes out,
> you'll understand why they shouldn't have messed with me."

(Docket Entry No. 27-1 at 2–3).

Chief Lunsford made this finding with the following information from Slaven :

> I advised Ms. Poe I was conducting an investigation and she
> cooperated fully.  Ms. Poe advised she has known [] January
> approximately three years since she has been employed with the
> [City]. . . . She advised she has interacted with [] January frequently
> and is very familiar with his usual demeanor.  Ms. Poe stated she
> received a voice message from FF January on March 28, 2019
> approximately 1130 hours and when she listened to the message she
> noticed [] January's speech to be "slurred and relaxed".  This
> concerned Poe because [] January's speech is usually "quick, sharp
> and precise".  Approximately 1349 hours on March 28, 2019 []
> January emailed Ms. Poe to request to see paperwork from an
> Attorney General's (AG) ruling reference a Freedom of Information
> (FOI) request.  Shortly after [] January sent the email at
> approximately 1349 hours, but before Ms. Poe responded back at
> approximately 1402 hours, [] January again called Ms. Poe.  Ms.
> Poe stated she recognized the phone number and asked IT Director,
> Bill Wavra, (who just happened to be in her office) to please witness
> their conversation since she felt FF January was acting out of sorts.
> During this phone conversation, broadcast over the speaker, Ms. Poe

again noticed [] January appeared to have "relaxed slurred speech" and was now more convinced he appeared impaired. The [City Manager] also happened to notice [] January's voice over the speaker phone and stepped into Ms. Poe's office. After the end of the phone conversation Ms. Poe warned the [City Manager] that [] January did not sound right at which time the [City Manager] told her to let him know if [] January showed up at [City Hall]. . . . Approximately 1530 hours on March 28, 2019 [] January did bring a copy of the AG paperwork to Ms. Poe at her office. Ms. Poe advised she asked for the paper(s) to make a copy and he refused to give her the paper(s) stating he would make the copy for her. This seemed extremely out of character for [] January, according to Ms. Poe, since FF January routinely requested Ms. Poe make him copies. Ms. Poe then followed FF January to the copy room where [] January made the copy and provided it to Ms. Poe. While in the copy room and away from all other employees, [] January reportedly blocked Ms. Poe's exit from the copy room and stated "when all this information comes out you'll understand why they shouldn't have messed with me". Ms. Poe was visibly shaken as she relayed this information to me and even cried briefly. Ms. Poe advised that she was so frightened and intimidated that when she saw an opportunity she "darted" passed [*sic*] January and went to the women's restroom where she knew [] January wouldn't follow her. I asked Ms. Poe if she thought [] January brought discredit to himself, his department and/or City. She replied "yes" stating that he acted unprofessional, threatening, intimidating and out of sorts. I finally asked if she thought [] January was impaired and she replied "yes".

(Docket Entry No .27-1 at 10–11).

Based on this information, it was reasonable for Chief Lunsford to conclude that January had engaged in unprofessional conduct towards Poe. And multiple employees, none of whom January argues had a retaliatory motive, reported to Slaven, who then reported to Chief Lunsford, that they thought January's behavior was unprofessional and a discredit to the City. (Docket Entry No. 27-1 at 15).

Last, January argues that Chief Lunsford's reasons for the firing were not worthy of credence because they did not align with the original April 1, 2019, complaint the City issued

33

against January.   Chief Lunsford explained to January on April 1, 2019, that the following

complaint had been lodged against him:

> On or about Thursday, March 28, 2019, on your scheduled day off, you telephoned City Hall.   You reportedly displayed slurred, partially incoherent speech and demeanor that caused employees to be concerned about your condition.   Out of an abundance of concern this was reported to the City Manager who also overheard parts of the conversation.   He concurred that you sounded partially incoherent and he reported that to me.   Later that day, you physically went to City Hall and displayed the same mannerisms.   This was so concerning that the police were called to investigate.   Lt. Jim Barnes, Sgt. Slavin Richards, and myself responded to City Hall and made contact with you in the City Manager's office.   While there I personally observed the same behavior.   During our interaction you noted that you were not on any medication that would cause such behavior but were merely sleep deprived.   You were offered, and refused, a urine screen and a Horizontal Gaze Nystagmus evaluation.   Due to your impairment you were  not allowed to drive. You were permitted to leave with your wife.

(Docket Entry No. 30-1 at 245).

The fact that the Chief informed January on April 1 that his March 28 demeanor and

behavior were under investigation, and that the investigation later revealed more details about the

incident with Poe and observations by various IT employees does not raise an inference of

suspicion.   January argues that "[w]hen an employer searches for additional justifications for a

decision, it is an indication of pretext."   But January relies on cases in which the employer sought

or presented additional inconsistent reasons for firing an employee *after* the decision to terminate

the employee had been made.   *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 236–

37 (5th Cir. 2015).   The decision to investigate was not a decision to terminate January, and January

does not point to evidence that Chief Lunsford had already decided to terminate him when the

investigation started, or that Chief Lunsford solicited additional reasons for firing January post his

decision to terminate him.  Nor is there evidence that Chief Lunsford gave different reasons for firing January after the termination occurred.

In sum, there is no basis to conclude that Chief Lunsford's findings on April 12, 2019, were "unbelievable," unworthy of credence, or motivated by retaliatory or discriminatory motive. January does not argue that the investigation was tainted, lacked thoroughness, or was conducted in an abnormal way.  *Owens*, 33 F.4th at 829.  Nor does he argue that the investigator, Slaven, or other employees, such as the City Hall IT employees, had any reason to lie to Slaven on the basis of any animus against January.  Even if every City Hall employee were aware that January had low blood sugar on March 28, 2019, that knowledge did not require them to ignore all misconduct. *See Baustian v. State of Louisiana*, 108 F.3d 332, 1997 WL 73790, at \*2 (5th Cir. 1997) (per curiam) (recognizing difference between disability and misconduct); *see also Macy v. Hopkins Cty. Bd. of Educ.*, 429 F. Supp. 2d 888, 899 (W.D. Ky. 2006) ("[I]f an employer fires an employee because of the employee's unacceptable behavior or misconduct, the fact that the behavior or misconduct was precipitated by a disabling condition does not present an issue under the [Americans with Disabilities Act] or Section 504 of the Rehabilitation Act." (citing cases from the U.S. Court of Appeals for the Seventh, Ninth, and Fourth Circuits)).  January chose to drive to City Hall on a day that he was impaired—whether from lack of sleep, low blood sugar, a substance, or some combination.  January's behavior violated City policies.  The City had warned January in 2016 that additional policy violations would result in termination.  (Docket Entry No. 27-10 at 2). The City acted consistently with that warning.

January's retaliation claim fails.  He has failed to show the causal link necessary for a *prima facie* case, and he has failed to show that Chief Lunsford's decision to fire him was a pretext for a retaliatory or discriminatory motive.  January's retaliation claim is dismissed.

35

## V.     Conclusion

The City's motion for summary judgment, (Docket Entry No. 27), is granted.   Final judgment is entered separately.

SIGNED on June 24, 2022, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge